1  Michael A. Jones, State Bar #27311
   Philip J. Giles, State Bar #30340
2  David B. Nelson, State Bar #34100
   **ALLEN BARNES & JONES, PLC**
3  1850 N. Central Ave., Suite 1150
   Phoenix, Arizona 85004
4  Ofc: (602) 256-6000
   Fax: (602) 252-4712
5  Email  mjones@allenbarneslaw.com
          pgiles@allenbarneslaw.com
6          dnelson@allenbarneslaw.com

7  Attorneys for Debtors

8                    **UNITED STATES BANKRUPTCY COURT**

9                         **DISTRICT OF ARIZONA**

| | |
|---|---|
| 10  In re: | Chapter 11 |
| 11  SILVERADO STAGES INC., et al., | Case No. 2:18-bk-12203-MCW (Joint Administration Motion Pending) |
| 12                    Debtors. | |

| | |
|---|---|
| 13  This filing applies to: | Case No. 2:18-bk-12203-MCW |
| | Case No. 2:18-bk-12205-DPC |
| 14  ☒ ALL DEBTORS | Case No. 2:18-bk-12207-BKM |
| ☐ SILVERADO STAGES INC. | Case No. 2:18-bk-12209-MCW |
| 15  ☐ SILVERADO CHARTER | Case No. 2:18-bk-12210-MCW |
| SERVICES, LLC | Case No. 2:18-bk-12213-EPB |
| 16  ☐ MICHELANGELO LEASING INC. | Case No. 2:18-bk-12215-BKM |
| | Case No. 2:18-bk-12218-EPB |
| 17  ☐ SILVERADO STAGES SC, LLC | |
| ☐ SILVERADO STAGES CC, LLC | **EMERGENCY MOTION TO EMPLOY** |
| 18  ☐ SILVERADO STAGES NC, LLC | **CHIEF RESTRUCTURING OFFICER** |
| ☐ SILVERADO STAGES NV, LLC | ***NUNC PRO TUNC*** **TO THE PETITION** |
| 19  ☐ SILVERADO STAGES AZ, LLC | **DATE PURSUANT TO 11 U.S.C. § 363(b)** |
| 20 | **Hearing Date:   TBD** |
| | **Hearing Time:   TBD** |
| 21 | **Hearing Loc.:    TBD** |

22         Silverado Stages, Inc., Silverado Stages CC, LLC, Silverado Stages SC, LLC, Silverado

23  Stages NC, LLC, Silverado Stages NV, LLC, Silverado Stages AZ, LLC, Silverado Charter

24  Services, LLC, and Michelangelo Leasing Inc., debtors-in-possession (collectively, the

25  "**Debtors**") in the above-captioned Chapter 11 cases (collectively, the "**Cases**"), hereby move

26  this Court for the entry of an order ("**Order**") under §§ 105(a) and 363 approving employment

27  of Sonoran Capital Advisors, LLC ("**Sonoran**") pursuant to the terms of the engagement

28  agreement ("**Engagement Agreement**") between Sonoran and the Debtors attached to this

{00130224 2}

Application as **Exhibit A**. Pursuant to the Engagement Agreement, Matthew Foster of Sonoran will serve as Chief Restructuring Officer ("**CRO**") to the Debtors. The entire record before the Court, *Verified Statement of Matthew Foster in Support for the Emergency Motion to Employ Chief Restructuring Officer <u>Nunc Pro Tunc</u> to the Petition Date Pursuant to 11 U.S.C. § 363(b)* ("**Foster Declaration**"), and the following Memorandum of Points and Authorities supports this Motion.

<u>**MEMORANDUM OF POINTS AND AUTHORITIES**</u>

<u>**Jurisdiction and Venue**</u>

1. The Debtors are affiliated entities, share common management, and collectively operate a service-oriented passenger transportation business known as "Silverado Stages."

2. The Debtors each filed voluntary petitions for relief under Chapter 11 on October 5, 2018. The Debtors have filed a *Motion for Order Authorizing and Directing Joint Administration and Use of Consolidated Caption* requesting to jointly administer the above-captioned cases. The Debtors continue to operate their businesses as debtors-in-possession in accordance with 11 U.S.C. §§ 1107 and 1108.

3. This Court has jurisdiction over the Cases under 28 U.S.C. §§ 157 and 1334. This Motion is a core proceeding related to the administration of the bankruptcy estates under 28 U.S.C. § 157(b)(2).

4. The Debtors maintain their headquarters and principal place of business in Phoenix, Arizona, specifically at 2239 N. Black Canyon Hwy Phoenix, AZ 85009. Accordingly, venue for these Cases is proper in this District under 28 U.S.C. §§ 1408 and 1409.

5. No trustee or examiner has been appointed in this case, nor has an official committee of unsecured creditors been established.

<u>**Qualifications of Sonoran**</u>

6. The Debtors understand and recognize that Sonoran has a wealth of experience in providing consulting services in restructurings and reorganizations of distressed middle-market companies, and enjoys an excellent reputation for services it has rendered complex chapter 11 cases on behalf of debtors and creditors throughout the United States. Sonoran

specializes in interim executive management, turnaround consulting, operational due diligence, creditor advisory services, and financial and operational restructuring. Sonoran's debtor-advisory services, and its personnel's experiences, have included wide range of activities targeted at stabilizing and improving a company's financial position, including developing or validating forecasts and business plans and related assessments of a business's strategic position, monitoring and managing cash flow, and supplier relationships, assessing and recommending cost-reduction strategies, and designing and negotiating financial restructuring packages.

7.  Mr. Foster is the Managing Director of Sonoran and is based in Mesa, Arizona. He has over 13 years of experience in corporate restructuring, private equity, consulting, and executive management. Mr. Foster has served as CRO and Chief Financial Officer ("**CFO**") for many companies.

8.  The Debtors engaged Mr. Foster and Sonoran as CRO to help plan and implement the Debtors' restructuring in light of their expertise in restructurings and reorganizations of similar businesses. Accordingly, the Debtors submit that the retention of Sonoran and the designation of Mr. Foster as CRO on the terms and conditions set forth herein are in the best interests of the Debtors' estates, creditors and all other parties-in-interest.

<u>**Services to be Rendered**</u>

9.  Subject to further order of this Court, Mr. Foster will serve as the CRO of the Debtors and perform those duties set forth in the Engagement Agreement and this Application. In addition, Sonoran will provide additional employees or independent contractors of Sonoran or its affiliates ("**Additional Personnel**") as may be required from time to time (collectively, with the Mr. Foster, the "**Engagement Personnel**"), to assist the Mr. Foster in the execution of his duties. Mr. Foster will assist the Debtors in developing and executing a plan to evaluate the operations and financial functions of the Debtors and provide recommendations with respect to the execution and oversight of those functional areas. If this Motion is granted, Mr. Foster's shall, among other responsibilities:

/ / /

a. Lead and Direct Additional Personnel together and in cooperation with the Debtors' Chief Executive Officer ("**CEO**"), and other applicable officers of the Debtors, in performing a financial review of the Debtors, including but not limited to a review and assessment of financial information, short and long-term projected cash flows and operating performance;

b. Identify and, if applicable, implement, cost reduction and operations improvement opportunities as well as manage the Debtors' relationships with vendor and suppliers;

c. Assist the CEO, other officers of the Debtors, and the Debtors' other engaged professionals, with the development of restructuring plans or strategic alternatives intended to maximize the enterprise value of the Debtors;

d. Develop and implement cash management strategies, tactics and processes, and shall work with the Debtors' treasury department and other professionals and coordinate the activities of the representatives of other constituencies in the cash management process;

e. Liaise with Debtors' counsel, board members, and creditor constituencies;

f. Oversee 13-week cash flow, cash collateral budgeting, and creation of statements and schedules;

g. Oversee and participate in initial debtor interview and other interaction with U.S. Trustee;

h. Oversee and sign monthly operating reports ("**MORs**");

i. Oversee, as necessary, the creation of plan and/or sale and/or settlement projections, analyses, and related court requirements;

j. Provide testimony as my be required in connection with any of the foregoing or may otherwise be required in a chapter 11 case; and

k. To the extent the Debtors' CFO resigns, assume the duties normally associated with the position of CFO of entities comparable to the Debtors;

l. Perform such other services as may be reasonably requested or directed by the board of directors and/or other authorized personnel; provided, however, that such services are not duplicative of work others are performing for the Debtors.

**<u>Disinterestedness</u>**

10. Although the Debtors do not propose to retain Mr. Foster under 11 U.S.C. § 327, to the best of the Debtors' knowledge, information and belief, based on and other than as set forth in the Foster Declaration, neither Mr. Foster nor Sonoran holds or represents an interest adverse to the Debtors' estates and is a "disinterested person," as that term is defined in 11

U.S.C. §§ 101(14) and 1107(b) with respect to the matters for which they are to be retained. To the best of the Debtors' knowledge, information, and belief, based on and other than as stated in the Foster Declaration, neither Mr. Foster nor Sonoran has any connection with the Debtors or their affiliates, their creditors, their estates, any United States District Judge or United States Bankruptcy Judge for the District of Arizona, the United States Trustee or any person employed in the office of the United States Trustee for Region 14, or any other party-in-interest, or their respective attorneys and accountants.

11. To the best of the Debtors' knowledge, information, and belief, based on and other than as set forth in the Foster Declaration, the disclosures made by Mr. Foster in the Foster Declaration (regarding connections with the Debtors, their creditors, any other parties-in-interest in these cases, their respective attorneys and accountants, any United States District Judge or United States Bankruptcy Judge for the District of Arizona, the United States Trustee or any person employed in the office of the United States Trustee for Region 14) satisfy any disclosure requirements necessary to employ Mr. Foster through Sonoran.

## **Compensation**

12. Pursuant to the Engagement Agreement, Sonoran's compensation shall consist of the following:

    a) A monthly, non-refundable advisory fee of $35,000 due and payable in advance, with the first payment paid on October 5, 2018 and all subsequent payments due on the first business day of each month thereafter. Nineveh Holdings, LLC ("**Nineveh**"), a third-party, paid the initial $35,000 fee.

    b) Hourly fees for the services of the Additional Personnel at the following hourly billing rates:

        (i)      Managing Directors = $425 per hour

        (ii)     Senior Consultants = $350 per hour

        (iii)    Associates = $295 per hour

        (iv)    Analysts = $195 per hour

    c) Reimbursement for Sonoran's reasonable out-of-pocket expenses incurred in connection with this assignment, such as travel, lodging, duplicating, messenger and telephone charges. All fees and expenses will be billed and payable on a monthly basis.

/ / /

13.     The Debtors have agreed to pay Sonoran's invoices as they are presented on a monthly basis. Mr. Foster's role in these cases requires that Mr. Foster be responsible for the day-to-day oversight of several areas of the Debtors' business. Consequently, the Debtors believe that Mr. Foster and Sonoran should not be subject to the same compensation schedule as professionals in these cases.

14.     The Debtors will pay in full Sonoran's monthly advisory fee and expenses each month pursuant to 11 U.S.C. § 363(b). Because the Debtors will not employ Sonoran as a professional under 11 U.S.C. § 327(a), Sonoran will not be required to submit fee applications pursuant to 11 U.S.C. §§ 330 and 331.  Instead, Sonoran will file with the Court, and provide notice to the U.S. Trustee and any statutory committee appointed (collectively, the "**Notice Parties**"), reports of compensation earned and expenses incurred on at least a quarterly basis. Such compensation and expenses shall be subject to Court review in the event that an objection is filed.  In addition, Sonoran will file with the Court and provide the Notice Parties a report on staffing ("**Staffing Report**"), including the names and tasks filled by all Engagement Personnel, by the 20th of each month for the previous month.  The Staffing Report shall be subject to review by the Court if so requested by any of the notice Parties.

15.     Prior to the Petition Date, Nineveh has provided Sonoran with a $25,000.00 retainer ("**Retainer**") to be held by Sonoran in trust.  Sonoran will return the Retainer upon payment of all outstanding invoices or Sonoran may apply the Retainer to outstanding invoices as permitted by the Court.

16.     Apart from the Retainer, the Debtors have not previously paid Mr. Foster or Sonoran any amounts. Neither Mr. Foster nor Sonoran was engaged by the Debtors prior to October 5, 2018. As such, neither Mr. Foster nor Sonoran has incurred any unpaid fees or expenses on behalf of the Debtors prior to October 5, 2018.

17.     In addition to the compensation structure described above and detailed in the Engagement Agreement, the Engagement Agreement provides that the Debtors will indemnify Sonoran to the same extent as the most favorable indemnification the Debtors extends to its officers or directors. The Debtors believe that the indemnity agreement set forth in the

Case 2:18-bk-12203-MCW    Doc 13    Filed 10/08/18    Entered 10/08/18 16:39:03    Desc
                          Main Document        Page 6 of 23

Engagement Agreement is customary and reasonable for restructuring engagements both out-of-court and in the context of a chapter 11 bankruptcy. *See, e.g., In re Eurofresh*, No. 09-07970-CGC (Bankr. D. Ariz., Jun. 8, 2009) [ECF No. 196].

18. The compensation structure outlined above was negotiated at arm's length and is consistent with Sonoran's normal and customary billing practices in chapter 11 cases. The compensation arrangement provided for in the Engagement Agreement and generally described above is consistent with, and typical of, arrangements entered into by Sonorans and other restructuring firms of comparable standing in connection with the rendering CRO services to similar clients.

19. Other than as set forth above, no arrangement is proposed between the Debtors, Mr. Foster and Sonoran for compensation to be paid in the chapter 11 cases.

## Relief Requested and Authority

20. The Debtors believe that Mr. Foster is well qualified and uniquely able to serve them effectively and efficiently in the chapter 11 cases as CRO. The resources, capabilities and experience of Mr. Foster in advising the Debtors are crucial to the Debtors' successful restructuring. As such, the Debtors believe that the retention of Mr. Foster is in the best interest of the Debtors, their estates, their creditors and other parties-in-interest. Accordingly, the Debtors request that the retention of Mr. Foster be approved and made effective as of October 5, 2018.

21. The Bankruptcy Code provides in pertinent part that "[t]he court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title." 11 U.S.C. § 105(a). The Bankruptcy Code provides, in relevant part, that a debtor-in-possession "after notice and a hearing, may use, sell or lease other than in the ordinary course of business, property of the estate . . . ." 11 U.S.C. § 363(b). Under applicable case law, if a debtor's proposed use of its assets under § 363(b) represents a reasonable business judgment on the part of the debtor, such use should be approved. *See, e.g.*, *In re Walter*, 83 B.R. 14, 17 (B.A.P. 9th Cir. 1987); *In re 240 North Brand Partners, Ltd.*, 200 B.R. 653, 659 (B.A.P. 9th Cir. 1996) (citing *In re Lionel Corp.*, 722 F.2d 1063, 1070 (2d Cir. 1983)); *Stephens Indus., Inc.*

*v. McClung*, 789 F.2d 386, 390 (6th Cir. 1986); *In re Martin*, 91 F.3d 389, 395 (3d Cir. 1996); *In re Delaware & Hudson Railway Co.*, 124 B.R. 169, 175-76 (D. Del. 1991); *In re Johns Manville Corp.*, 60 B.R. 612, 616 (Bankr. S.D.N.Y. 1986) ("Where the debtor articulates a reasonable basis for its business decisions (as distinct from a decision made arbitrarily or capriciously), courts will generally not entertain objections to the debtor's conduct").

22.     Bankruptcy courts have analyzed the propriety of a debtors' employment of corporate restructuring officers, restructuring advisors and restructuring professionals under § 363 on numerous occasions and have determined that it is an appropriate exercise of business judgment to employ a restructuring or other type of professional in this manner. *See, e.g., In re Mercedes Homes, Inc.*, No. 09-11191 at D.E. 72 (Bankr. S.D. Fla. 2009); see also Kevin M. Baum, *The Basics for Retaining a CRO*, 30-8 ABIJ 50 (Oct. 2011) (discussing retention of CROs under § 363 and related cases).

23.     As described above, the employment of Sonoran under the Engagement Agreement would greatly benefit the Debtors' estates and creditors. Mr. Foster has substantial experience in assisting distressed businesses. The Debtors submit that the immediate employment of Sonoran under the Employment Agreement is in the best interests of the estates and creditors.

24.     The Debtors submit that the progress made in the initial stages of these chapter 11 cases will be a determinative factor in the ultimate outcome of the cases. Mr. Foster, as the Debtors' CRO, will play an integral role in all of the key work streams during this critical period.    Among other things, the Debtors will need Mr. Foster's assistance in stabilizing business operations, constructing a business plan and plan of reorganization, and defining the Debtors' path toward plan confirmation.

25.      Failure to have all of the resources of Mr. Foster readily available during these initial stages will severely hamper the Debtors' restructuring efforts and could jeopardize the ultimate outcome of the cases.  Therefore, the Debtors seek immediate entry of an interim order, substantially in the form attached to this Motion as **Exhibit B**, authorizing the Debtors to retain and employ Mr. Foster through Sonoran and to compensate Sonoran as set forth above and in

the Engagement Agreement. This interim form of relief ensures the availability of the full resources of Sonoran to the Debtors during a critical period in these cases, while preserving the ability of all parties-in-interest, including the U.S. Trustee and any potential future creditors' committee, to object to this Motion on a final basis. The form of proposed order granting the interim order attached preserves any objections of all creditors and parties-in-interest to the final hearing on this Motion.

WHEREFORE, the Debtors request (a) entry of an order authorizing the Debtors' retention and employment of Mr. Foster and Sonoran on the terms outlined in this Application; and (b) such other relief as is just and proper.

DATED: October 8, 2018.

**ALLEN BARNES & JONES, PLC**

*/s/ MAJ #27311*
Michael A. Jones
Philip J. Giles
David B. Nelson
1850 N. Central Ave., Suite 1150
Phoenix, AZ 85004
Attorneys for Debtors

# Exhibit A



Silverado Stages, Inc.
Brian Hunt, CEO
2239 North Black Canyon Hwy
Phoenix, AZ 85009

This letter confirms and sets forth the terms and conditions of the engagement between Sonoran Capital Advisors, LLC ("Sonoran") and Silverado Stages, Inc., Silverado Stages NV, LLC, Silverado Stages NC, LLC, Silverado Stages SC, LLC, Silverado Charter Services, LLC, Silverado Stages AZ, LLC, Silverado Stages CC, LLC, Michelangelo Leasing Inc., and their assigns and successors (the "Company"), including the scope of the services to be performed and the basis of compensation for those services. The CRO shall report to and take direction from the Company's board of directors (the "Board").

1.    Description of Services.

    (a)    Officers.  In connection with this engagement, Sonoran shall make available to the Company:

        (i)    Matthew Foster to serve as the Chief Restructuring Officer (the "CRO"); and

        (ii)    Sonoran will provide additional employees or independent contractors of Sonoran and/or its affiliates ("Additional Personnel") as may be required from time to time (collectively, with the CRO, the "Engagement Personnel"), to assist the CRO in the execution of the duties set forth more fully in this Agreement.

    (b)    Duties.

        (i)    The CRO shall have those powers and duties set forth in this Agreement along with such other powers and duties as may be prescribed by the Board;

        (ii)    The CRO shall lead and direct Additional Personnel together and in cooperation with the Company's Chief Executive Officer (the "CEO"), and other applicable officers of the Company, in performing a financial review of the Company, including but not limited to a review and assessment of financial information, short and long-term projected cash flows and operating performance (collectively, the "Financial Review");

        (iii)    The CRO shall, with the assistance of Additional Personnel, if necessary, together and in cooperation with the CEO, and other applicable officers of the Company, identify and, if applicable, implement, cost reduction and

- 1 -



operations improvement opportunities as well as manage the Company's relationships with vendor and suppliers;

(iv)     The CRO shall assist the Board, the CEO, other officers of the Company, and the Company's other engaged professionals, with the development of restructuring plans or strategic alternatives intended to maximize the enterprise value of the Company;

(v)      The CRO shall serve as the Company's principal contact with the Company's stakeholders with respect to the Company's financial and operational matters;

(vi)     The CRO shall, with the assistance of Additional Personnel, if any, together and in cooperation with the CEO, and other applicable officers of the Company, develop and implement cash management strategies, tactics and processes, and shall work with the Company's treasury department and other professionals and coordinate the activities of the representatives of other constituencies in the cash management process;

(vii)    To the extent the Company commences a petition for relief under Title 11 of the United States Code ("Bankruptcy Code"), the CRO shall, with the assistance of Additional Personnel, if necessary, together and in cooperation with the CEO, and other applicable officers of the Company and the Company's other engaged professionals and counsel, (a) liaise with debtor's counsel, independent board member, and creditor constituencies, (b) oversee 13-week cash flow and cash collateral budgeting, (c) oversee creation of statements and schedules, (d) oversee and participate in initial debtor interview and other interaction with U.S. Trustee, (e) oversee and sign monthly operating reports ("MORs"), (f) oversee, as necessary, the creation of plan and/or sale and/or settlement projections, analyses, and related court requirements, and (g) provide testimony as my be required in connection with any of the foregoing or may otherwise be required in a chapter 11 case; and

(viii)   To the extent the Company's chief financial officer ("CFO") resigns, the CRO shall assume the duties normally associated with the position of CFO of entities comparable to the Company including, but not limited to, management of  the Company's (a) accounting and finance staff, (b) treasury activities, (c) audits and other regulatory compliance obligations, and (d) financial statement publications required by the Board or other constituencies;

(ix)     The CRO and the Additional Personnel shall perform such other services as may be reasonably requested or directed by the Board and/or other authorized Company personnel; provided, however, that such services are not duplicative of work others are performing for the Company.

- 2 -



(c)      Sonoran is a firm that provides turnaround, crisis management, and financial advisory services. In some cases, Sonoran provides these services as advisors to management, in other cases one or more of its staff serve as corporate officers and other of its staff fill positions as full or part time employees. To be clear, this engagement letter sets forth Sonoran's engagement as CRO. In the event the Company commences a petition for relief under the Bankruptcy Code, the Company shall seek approval of this agreement under Bankruptcy Code section 363.

The application of Sonoran shall disclose the individual identified for CRO as well as the names and proposed functions of the Additional Personnel.

(d)      The Engagement Personnel shall not be employees of the Company, but will continue to be employed by, or contracted through, Sonoran. While rendering services to the Company, the CRO will not do anything to interfere with his duties to the Company; provided, however, that notwithstanding the foregoing, the CRO may fulfill his management and administrative obligations for Sonoran and existing engagements. The Additional Personnel may continue to work with other personnel at Sonoran in connection with unrelated matters that will not unduly interfere with the services rendered by the Engagement Personnel pursuant to this Agreement. With respect to the Company, however, the Engagement Personnel shall operate under the direction of the Board and Sonoran shall have no liability to the Company for the acts or omissions of the Engagement Personnel related to the performance or non-performance of services at the direction of the Board and consistent with the requirements of the Engagement and this Agreement. In addition, and notwithstanding the non-employee status of the Engagement Personnel, the CRO and any Additional Personnel who are designated as "officers" shall provide written acknowledgement of their agreement to comply with the Company's Code of Ethics and Business Conduct Policy (the "Code of Ethics"); provided, however, that it is understood that the Engagement Personnel's roles as employees and/or equity holders of Sonoran or any of its affiliates (as well as any engagements they participate in for other Sonoran clients) shall not be a violation of the Conflict of Interest section of the Code of Ethics unless such Engagement Personnel are directly involved on behalf of Sonoran in representing interests adverse to the Company.

2.      <u>Information Provided by Company and Forward Looking Statements</u>.

The Company shall use all reasonable efforts to (i) provide the Engagement Personnel with access to management and other representatives of the Company and (ii) furnish all data, material, and other information concerning the business, assets, liabilities, operations, cash flows, properties, financial condition and prospects of the Company that Engagement Personnel reasonably request in connection with the services to be provided to the Company. The Engagement Personnel shall rely, without further independent verification, on the accuracy and completeness of all publicly available information and information that is furnished by or on behalf of the Company and otherwise reviewed by Engagement Personnel in connection with the services performed for the Company. The Company


acknowledges and agrees that the Engagement Personnel are not responsible for the accuracy or completeness of such information and shall not be responsible for any inaccuracies or omissions therein, provided that if Sonoran or any of the Engagement Personnel become aware of material inaccuracies or errors in any such information they shall promptly notify the Board of such errors, inaccuracies or concerns. Sonoran and Engagement Personnel are under no obligation to update data submitted to them or to review any other areas unless specifically requested by the Board to do so.

The Company understands that the services to be rendered by the Engagement Personnel may include the preparation of projections and other forward-looking statements, and numerous factors can affect the actual results of the Company's operations, which may materially and adversely differ from those projections. In addition, Engagement Personnel will be relying in good faith on information provided by the Company in the preparation of those projections and other forward-looking statements.

3.    Limitation of Duties.

Neither Sonoran, nor the Engagement Personnel make any representations or guarantees that, *inter alia,* (i) an appropriate restructuring proposal or strategic alternative can be formulated for the Company, (ii) any restructuring proposal or strategic alternative presented to the Company's management or the Board will be more successful than all other possible restructuring proposals or strategic alternatives, (iii) restructuring is the best course of action for the Company, or (iv) if formulated, that any proposed restructuring plan or strategic alternative will be accepted by any of the Company's creditors, shareholders and other constituents. Further, neither Sonoran, nor the Engagement Personnel, assume any responsibility for the Company's decision to pursue, or not pursue any business strategy, or to effect, or not to effect any transaction. The Company agrees that Sonoran shall not have any obligation or responsibility to provide accounting, audit, management, tax, or legal services, and shall have no responsibility for designing or implementing operating, organizational, administrative, cash management, or liquidity improvements, or to provide any fairness or valuation opinions, or any advice or opinions with respect to solvency in connection with any transaction. The Engagement Personnel shall be responsible for implementation only of the restructuring proposal or alternative approved by the Board and only to the extent and in the manner authorized and directed by the Board.

4.    Compensation.

(a)    Sonoran will be paid by the Company for the services of the CRO at a billing rate of $35,000 per calendar month ("Monthly Fee"). The first Monthly Fee will be paid on October 5, 2018 and subsequent Monthly Fees will be paid on the 1st of every month.

(b)    Sonoran will be paid by the Company for the services of the Additional Personnel at the hourly billing rates outlined below ("Hourly Fees").

(i)    Managing Directors = $425 per hour

- 4 -


       (ii)        Senior Consultants = $350 per hour

       (iii)      Associates = $295 per hour

       (iv)      Analysts = $195 per hour

  (c)    In addition, Sonoran will be reimbursed for its reasonable out-of-pocket expenses incurred in connection with this assignment, such as travel, lodging, duplicating, messenger and telephone charges. All fees and expenses will be billed on a monthly basis and payable upon receipt.

  (d)    It is Sonoran's policy in these cases to receive a security retainer prior to the commencement of our activities to be held throughout this engagement. The retainer secures final payment of Sonoran's invoices for services rendered and expenses incurred. Given the magnitude and scope of the services you have requested, we require an advance of $25,000. This advance will be returned to the Company upon payment in full of Sonoran's outstanding invoices or applied to any outstanding invoices at the conclusion of this engagement.

5.    <u>Termination</u>.

  (a)    This Agreement will apply from the date hereof and may be terminated with immediate effect by either party without cause by written notice to the other party; <u>provided</u>, <u>however</u>, that if such notice is provided by Sonoran, such notice shall not become effective until the earlier of (a) thirty days after the date of such notice, and (b) such date that the Company notifies Sonoran that it no longer requires Sonoran's services.

  (b)    On termination of the Agreement, any undisputed fees and expenses due to Sonoran shall be remitted promptly (including fees and expenses that accrued prior to, but are duly invoiced subsequent to, such termination).

  (c)    The provisions of this Agreement that give the parties rights or obligations beyond its termination shall survive and continue to bind the parties.

6.    <u>No Audit</u>.

Company acknowledges and agrees that Sonoran and Engagement Personnel are not being requested to perform an audit, review, or compilation, or any other type of financial statement reporting engagement that is subject to the rules of the AICPA, SEC or other state or national professional or regulatory body.

7.    <u>No Third Party Beneficiary</u>.

The Company acknowledges that all advice (written or oral) provided by Sonoran and the Engagement Personnel to the Company in connection with this engagement is intended solely for the benefit and use of the Company (limited to its Board and management) in considering the matters to which this engagement relates. The Company agrees that no

- 5 -



such advice shall be used for any other purpose or reproduced, disseminated, quoted or referred to at any time in any manner or for any purpose other than accomplishing the tasks referred to herein without Sonoran's prior approval (which shall not be unreasonably withheld), except as required by law, regulation (including stock exchange rules) or legal or administrative process.

8.   <u>Conflicts.</u>

Sonoran is not currently aware of any relationship that has created or would create a conflict of interest with the Company or those parties-in-interest of which you have made us aware. Because Sonoran serves clients in numerous cases, both in and out of court, it is possible that Sonoran may have rendered or will render services to or have business associations with other entities or individuals which had or have or may have relationships with the Company, including creditors of the Company. Sonoran will not be restricted by virtue of providing the services under this Agreement from providing services to other entities or individuals, including entities or individuals whose interests may be in competition or conflict with the Company's, provided Sonoran makes appropriate arrangements to ensure that the confidentiality of information is maintained and provided that Sonoran will not represent the interests of any such entities or individuals directly in connection with the matters in which the Engagement Personnel are serving the Company.

9.   <u>Confidentiality/Non-Solicitation.</u>

Sonoran and the Engagement Personnel shall keep as confidential all non-public information received from the Company in conjunction with this Agreement, except: (i) as requested by the Company or its legal personnel; (ii) as required by legal proceedings; or (iii) as reasonably required in the performance of this Agreement. All obligations as to non-disclosure shall cease as to any part of such information to the extent that such information is or becomes public other than as a result of a breach of this provision. The Company, on behalf of itself and its subsidiaries, affiliates and any person that may acquire all or substantially all of its assets, agrees that, until two years subsequent to the termination of this engagement, it will not solicit, recruit, hire or otherwise engage for services any employee of Sonoran or any of its affiliates who worked with the Company's employees or representatives on this engagement while employed by Sonoran or its affiliates ("<u>Solicited Person</u>"). Should the Company or *any* of its subsidiaries or affiliates or any person who acquires all or substantially all of its assets extend an offer of employment to or otherwise engage any Solicited Person and should such offer be accepted, Sonoran shall be entitled to a fee from the party extending such offer equal to the Solicited Person's hourly client billing rate at the time of the offer multiplied by 4,000 hours for a Managing Director, 3,000 hours for a Senior Director and 2,000 hours for any other Sonoran employee, The Company acknowledges and agrees that this fee fairly represents the loss that Sonoran will suffer if the Company breaches this provision. The fee shall be payable at the time of the Solicited Person's acceptance of employment or engagement.

Further, without the Company's prior written consent, none of Sonoran's directors, officers or employees who have worked with the Company on this engagement will, for a period of two years subsequent to the termination of this engagement, directly or indirectly solicit,


recruit, hire or otherwise engage for services any employee of the Company or any of its affiliates who have worked with Sonoran's employees or representatives on this engagement while employed by the Company (a) for employment by Sonoran or by any of its affiliates or (b) to provide consulting or other services to or on behalf of Sonoran or any of its affiliates; provided, that, for the avoidance of doubt, the foregoing shall not prohibit the solicitation or employment by Sonoran or its affiliates of any employee of the Company not solicited by Sonoran's directors, officers or employees who have worked with the Company on this engagement.

10.   Indemnification/Limitations on Liability.

The Company shall indemnify the CRO and such other Engagement Personnel, if any, acting as officers (the "Indemnified Professionals") to the same extent as the most favorable indemnification it extends to its officers or directors, whether under the Company's bylaws, its certificate of incorporation, by contract or otherwise, and no reduction or termination in any of the benefits provided under any such indemnities shall affect the benefits provided to the Indemnified Professionals. The Indemnified Professionals shall be covered as officers under the Company's existing director and officer liability insurance policy. As a condition of Sonoran accepting this engagement; an endorsement to such director and officer liability policy evidencing such coverage shall be furnished to Sonoran prior to the effective date of this Agreement. The Company shall give thirty (30) days' prior written notice to Sonoran of cancellation, non-renewal, or material adverse change in coverage, scope, or amount of such director and officer liability policy. The provisions of this section are in the nature of contractual obligations and no change in applicable law or the Company's charter, bylaws or other organizational documents or policies shall affect the Indemnified Professionals' rights hereunder. The attached indemnity and limitation on liability provisions are incorporated into this Agreement, and the termination of this Agreement or the engagement shall not affect those provisions, which shall remain in full force and effect.

11.   Chapter 11 Proceedings.

In the event that the Company becomes a debtor under the Bankruptcy Code, the Company shall use its best efforts to promptly apply to the bankruptcy court having jurisdiction over the chapter 11 case or cases for the approval of this Agreement and Sonoran's retention by the Company under the terms of this Agreement. The Company shall supply Sonoran with a draft of such application and any proposed order authorizing Sonoran's retention that is proposed to be submitted to the bankruptcy court sufficiently in advance of the filing of such application or the submission of such order, as the case may be, to enable Sonoran and its counsel to review and comment on such application or order. Prior to commencing a chapter 11 case, the Company shall pay all undisputed amounts due and payable to Sonoran.

12.   Miscellaneous.

This Agreement (together with the attached indemnity provisions), including, without limitation, the construction and interpretation thereof, and all claims, controversies, and


disputes arising under or relating thereto, shall be governed and construed in accordance with the laws of the State of Arizona, without regard to principles of conflict of law that would defer to the laws of another jurisdiction. The Company and Sonoran agree to waive trial by jury in any action, proceeding or counterclaim brought by or on behalf of the parties hereto with respect to any matter relating to or arising out of the engagement or the performance or non-performance of Sonoran under this Agreement. The Company and Sonoran agree, to the extent permitted by applicable law, that any Federal Court sitting within the District of Arizona shall have exclusive jurisdiction over any litigation arising out of this Agreement; to submit to the personal jurisdiction of the Courts of the United States District Court for the District of Arizona; and to waive any and all personal rights under the law of any jurisdiction to object on any basis (including, without limitation, inconvenience of forum) to jurisdiction or venue within the State of Arizona for any litigation arising in connection with this Agreement.

This Agreement shall be binding upon Sonoran and the Company, their respective heirs, successors, and assignees, and any heir, successor, or assignee of a substantial portion of Sonoran's or the Company's respective businesses and/or assets, including any chapter 11 trustee. This Agreement incorporates the entire understanding of the parties with respect to the subject matter of this Agreement and supersedes all prior written or oral agreements and understandings with respect thereto; and may not be amended or modified except in writing executed by the Company and Sonoran. Notwithstanding anything in this Agreement to the contrary, Sonoran may reference or list the Company's name and/or a general description of the services in Sonoran's marketing materials, including, without limitation, on Sonoran's website.



Sincerely,

Matthew Foster
Managing Director
Sonoran Capital Advisors, LLC


Accepted and Agreed to:

By: _____

Name: ___Jim Galusha for the Company___

Title: ___Principal___

- 9 -

# Exhibit B

1
2
3
4
5
6

**UNITED STATES BANKRUPTCY COURT**

**DISTRICT OF ARIZONA**

| | |
|---|---|
| In re: | Chapter 11 |
| SILVERADO STAGES INC., et al., | Case No. 2:18-bk-12203-MCW<br>(Joint Administration Motion Pending) |
| Debtors. | |
| This filing applies to: | Case No. 2:18-bk-12203-MCW<br>Case No. 2:18-bk-12205-DPC<br>Case No. 2:18-bk-12207-BKM |
| ☒ ALL DEBTORS<br>☐ SILVERADO STAGES INC.<br>☐ SILVERADO CHARTER<br>  SERVICES, LLC<br>☐ MICHELANGELO LEASING INC.<br>☐ SILVERADO STAGES SC, LLC<br>☐ SILVERADO STAGES CC, LLC<br>☐ SILVERADO STAGES NC, LLC<br>☐ SILVERADO STAGES NV, LLC<br>☐ SILVERADO STAGES AZ, LLC | Case No. 2:18-bk-12209-MCW<br>Case No. 2:18-bk-12210-MCW<br>Case No. 2:18-bk-12213-EPB<br>Case No. 2:18-bk-12215-BKM<br>Case No. 2:18-bk-12218-EPB |
| | **ORDER GRANTING EMERGENCY MOTION (1) TO EMPLOY CHIEF RESTRUCTURING OFFICER *NUNC PRO TUNC* TO THE PETITION DATE AND (2) TO APPROVE PAYMENT UNDER TO 11 U.S.C. § 363(b).** |
| | **Date of Hearing:    October ____, 2018**<br>**Time of Hearing:** |

This matter came before the Court by the Debtors'[1] *Emergency Motion (1) To Employ Chief Restructuring Officer Nunc Pro Tunc to the Petition Date and (2) To Approve Payment Under 11 U.S.C. 363(b)* ("**Motion**"), for entry of an order approving employment of Sonoran pursuant to 11 U.S.C. §§ 105(a) and 363(b) and the terms of the Engagement Agreement between Sonoran and the Debtors. This Court conducted a hearing on the Motion on October _____, 2018. Having reviewed the Motion, Foster Declaration, and upon the evidence and

---

[1] Unless otherwise noted herein, capitalized terms shall retain the meanings attributed to them in the Motion.

argument presented at the Hearing, this Court finds and concludes that: (i) the relief requested in the Motion is in the best interest of the Debtors, their estates, their creditors, and all other parties-in-interest; (ii) the relief requested in the Motion is necessary to avoid immediate and irreparable harm to the Debtors and their estates; (iii) good, adequate and sufficient cause has been shown to justify entry of this Order; (iv) the Court has jurisdiction to consider the Motion and the relief requested therein pursuant to 28 U.S.C. §§ 157 and 1334; (v) consideration of the Motion and the relief requested therein is a core proceeding pursuant to 28 U.S.C. § 157(b); and (vi) venue is proper in this District pursuant to 28 U.S.C. §§ 1408 and 1409. In light of the foregoing and after due deliberation and sufficient cause therefor,

**ORDERED** as follows**:**

1.       The Motion is GRANTED as modified in this Order.

2.       The Debtors are authorized to retain and employ Sonoran as their Chief Restructuring Officer ("**CRO**") in accordance with the terms and conditions set forth in the Motion and in the Engagement Agreement attached as Exhibit A to the Motion.

3.       Mr. Foster, as CRO, will have the responsibilities and duties as set forth in the Motion, the Engagement Agreement, and this Order. Notwithstanding any restrictions that may be imposed by the Debtors' board of directors, the CRO is authorized to communicate directly with third parties regarding potential strategic and financial alternatives, and to communicate directly to the Debtors' prepetition lenders, including the CRO's personal views, regarding any matters within the scope of his duties. The CRO will, if necessary, coordinate such communication with counsel for the Debtors to ensure that applicable attorney client and work product privileges are preserved, unless expressly waived.

4.       The Debtors are authorized to pay in full Sonoran's monthly advisory fee and expenses each month pursuant to 11 U.S.C. § 363(b).  Sonoran will not be required to submit fee applications pursuant to 11 U.S.C. §§ 330 and 331.  Instead, Sonoran will file with the Court, and provide notice to the U.S. Trustee and any statutory committee appointed (collectively, the "**Notice Parties**"), reports of compensation earned and expenses incurred on at least a quarterly basis.  Such compensation and expenses shall be subject to Court review in the

event that an objection is filed. In addition, Sonoran will file with the Court and provide the Notice Parties a report on staffing ("**Staffing Report**"), including the names and tasks filled by all Engagement Personnel, by the 20th of each month for the previous month. The Staffing Report shall be subject to review by the Court if so requested by any of the notice Parties.

5. The Debtors and Sonoran are authorized to take all actions necessary to effectuate the relief granted by this Order in accordance with the Motion.

6. This Court retains jurisdiction with respect to all matters arising from or related to the implementation of this Order.

**DATED AND SIGNED ABOVE**